UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JANET ORTIZ, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 14-30149-MGM |
| CAROLYN W. COLVIN, | * | |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION
TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 12 and 16)

October 20, 2015

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

This is an action for judicial review of a final decision by Carolyn Colvin, the acting

Commissioner of the Social Security Administration ("Commissioner"), regarding an individual's

entitlement to Social Security Disability Insurance ("SSDI") benefits pursuant to 42 U.S.C. § 405(g)

and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1383(c)(3) (referring to 42 U.S.C.

§ 405(g)).  Janet Ortiz ("Plaintiff") asserts the Commissioner's decision denying her such

benefits—memorialized in a February 28, 2013 decision of an administrative law judge ("ALJ")—is in

error. She has filed a motion for judgment on the pleadings and the Commissioner has moved to

affirm.

For the following reasons, the court will allow the Commissioner's motion (Dkt. No. 16)

and deny Plaintiff's motion (Dkt. No. 12).

## II.   BACKGROUND

Plaintiff was born in 1967 and completed her twelfth grade education in Puerto Rico.[1] (Administrative Record ("A.R.") at 42, 45–46.)  She has reading and writing abilities in Spanish but not in English.  (*Id.* at 45–46.)  She previously worked as a packer and was capable of lifting heavy loads between twenty-five and forty-five pounds.  (*Id.* at 44.)  Plaintiff has two adult children, one of whom lives at home and assists with the household chores.  (*Id.* at 46–47.)

Plaintiff filed for SSDI and SSI benefits on June 16, 2011,[2] asserting that she was "disabled due to fibromyalgia, depression, anxiety, arthritis, tendonitis, asthma, high cholesterol [and] inflammation [of the] right foot."  (*Id.* at 63, 74, 224.)  This application was denied initially on September 6, 2011, and again on reconsideration on December 9, 2011.  (*Id.* at 16.)  Plaintiff then requested a hearing in front of an administrative law judge, which took place on February 11, 2013. (*Id.*)

A.   Medical History on Record

Plaintiff claims that her physical and mental symptoms have limited her ability to work and function normally; her alleged impairments began on June 5, 2007.  (A.R. at 16.)  On June 19, 2007, Dr. Pierangelo at Hampden County Physician Associates Rheumatology assessed Plaintiff's fibromyalgia.  (A.R. at 435.)  Plaintiff complained that the pain felt like "burning in her ankles, burning in her face and in her back."  (*Id.*)  She also reported that she felt "really tired and sleepy,"

---

[1] The court notes a discrepancy regarding Plaintiff's date of birth.  In her testimony at the administrative hearing, Plaintiff claimed her birthday is April 4, 1967 (A.R. at 42), whereas the medical records beginning at page 273 of the administrative record show April 11, 1967 as her date of birth.  This discrepancy, however, is not material to the court's decision.

[2] In her applications for SSDI and SSI benefits, Plaintiff alleged a disability onset date of June 5, 2007.  (A.R. at 16.) Plaintiff previously applied for both SSDI and SSI benefits on March 28, 2007 and June 15, 2007, respectively.  (*Id.* at 64, 75.)  On February 17, 2011, ALJ Judith Stolfo issued a decision finding Plaintiff was not disabled.  (*Id.* at 17.)  On May 24, 2011, that decision became final after the Appeals Council did not take action on Plaintiff's request for review.  (*Id.*) In light of this initial denial, the parties agree that the relevant time period under review on this appeal is from May 25, 2011 to the date of the ALJ's decision on February 28, 2013.  (*Id.* at 17 & n.1, 40)

and was unable to walk well.  (*Id.*)  Dr. Pierangelo determined that her back pain may "exacerbate her symptoms" and prescribed her medication.  (*Id.* at 436.)  On January 7, 2008, Dr. Pierangelo stated that Plaintiff's back pain, which "waxe[d] and wane[d], but never [went] away," was caused by a muscle spasm.  (*Id.* at 431.)  He prescribed Lyrica for treatment.  (*Id.*)

Plaintiff underwent seven sessions of physical rehabilitation at Baystate Rehabilitation Care ("Baystate") beginning August 29, 2007, after which she reported a decrease in pain due to her use of heat and compliance with the stretching treatment program.  (*Id.* at 357–62.)  She alleged prior to discharge that she felt fifty percent better overall.  (*Id.* at 360.)  During another fourteen-session round of treatment, which occurred between November 25, 2008 and January 16, 2009, Plaintiff's occupational therapist, Ms. Marcia Funk, stated Plaintiff was "making progress in occupational therapy" with a decrease in pain.  (*Id.* at 366–75.)  Ms. Funk further stated Plaintiff "could benefit from continued OT to address pain management and functional activities."  (*Id.*)  Although the treatment records appear incomplete upon review, it appears Plaintiff thereafter continued occupational therapy at Baystate in June of 2009, December of 2009, and July of 2010.  (*Id.* at 452, 539–42, 450.)

On June 21, 2010, Dr. Pierangelo prescribed Plaintiff a small dose of muscle relaxers and recommended therapeutic exercises to decrease persistent back pain.  (*Id.* at 419.)  For her elbow pain, which caused her "difficulty . . . holding objects in the right hand because of pain," Dr. Pierangelo gave Plaintiff injections and recommended a "tennis elbow brace, wrist brace, and nighttime wrist splint," as well as Tylenol for pain.  (*Id.* at 429, 420.)  Dr. Pierangelo provided cortisone injections for pain in Plaintiff's right and left elbows on March 14, 2008, August 25, 2008, and November 23, 2009.  (*Id.* at 429–30, 428, 708, 423.)  These injections reportedly had minimal effects.  (*Id.* at 429, 427, 426, 420, 422, 419.)  Dr. Pierangelo injected Plaintiff's right heel on August

12, 2009, which reportedly reduced the pain. (*Id.* at 425, 424.)  He also provided injections to

Plaintiff's left heel on August 2, 2010 and February 28, 2011. (*Id.* at 418, 343–45.)

On November 1, 2010, Plaintiff complained of pain in her right knee that made her

"uncomfortable walking on it" and affected her ability to "ascend[] or descend[] stairs." (*Id.* at 416.)

Dr. Pierangelo stated that "the whole issue with the knee is related to the ankle" but that "with some

strengthening exercises for her knee [he thought] that she would regain full use." (*Id.* at 417.)  He

"asked her to get an orthotic and a knee brace." (*Id.*)

After May 25, 2011, which the parties agree represents the relevant time period for present

purposes, *see supra* footnote 2, Plaintiff continued her treatment programs.  Dr. Harry Courniotes at

Foot Specialists Associates, Inc. administered cortisone injections to Plaintiff's left heel on July 26,

2011, August 9, 2011, and August 16, 2011. (*Id.* at 348–49, 346–47, 685–86.)  These injections

reportedly "provided no benefit." (*Id.* at 341–42, 695–96.)  She underwent physical therapy through

Baystate from July 11, 2011 to August 15, 2011, and then again from January 9, 2012 to February 24,

2012. (*Id.* at 350–55, 688–92.)  During the July 11, 2011 intake assessment, the physician stated that

Plaintiff's functional limitations restricted her tolerance for walking to ten minutes, which "limit[ed]

[her] ability to do community activities" and activities of daily living. (*Id.* at 354.)  At the time of her

discharge on August 15, 2011, Plaintiff reported having good and bad days and self-assessed her

pain level between zero to five out of ten. (*Id.* at 350.)  In her 2012 round of physical therapy,

Plaintiff was frequently reminded of the importance of wearing appropriate footwear—sneakers

rather than boots or sandals—and maintaining consistency with her home exercise program. (*Id.* at

689–90.)  When she was compliant with these two recommendations, she reported a decrease in

pain and an ability to function better. (*Id.* at 689–90.)  Plaintiff conveyed to Dr. Pierangelo on July

5, 2011 that "sneakers [were] more comfortable and help[ed] with the pain but she [didn't] like to

wear them in the summer" and "similar issues with the right foot . . . got better with therapy."  (*Id.* at 411.)

      At New England Orthopedic Surgeons ("NEOS"), Dr. Morton Lynn assessed Plaintiff on April 6, 2012.  (*Id.* at 741–42.)  He stated that "she ha[d] several episodes a week of more severe pain, but at other times, the pain [was] fairly minimal."  (*Id.* at 741.)  He further asserted that "in light of the intermittent nature of the symptoms," the problem could be resolved with "patience and the use of a better insert."  (*Id.* at 742.)  Dr. Lynn indicated on July 19, 2012 that Plaintiff "never obtained any arch supports," however, and continued to have pain.  (*Id.* at 740.)  On October 9, 2012, as a follow-up to her August 2, 2012 NEOS appointment, Ms. Miriam Wiggins stated Plaintiff's left heel pain was "much improved" after her use of a carbon-fiber ankle-foot brace, which she "found to be quite comfortable."  (*Id.* at 737–39, 736.)  Ms. Wiggins prescribed Plaintiff additional physical therapy and medication on February 5, 2013.  (*Id.* at 797–98.)

      In her testimony at the administrative hearing, Plaintiff detailed her alleged body pains, specifically indicating pain in her elbows, shoulders, knees, hips, ankles, and hands.  (*Id.* at 42–44, 47.)  She noted her pain felt like a "current is running through [her] body and a burning feel[ing]."  (*Id.* at 47.)  When asked the extent to which her physical ailments impacted her ability to return to work, Plaintiff responded that "[her] joints hurt too much and [her] hands can't lift weight" and, relatedly, that she has trouble picking up and holding objects, and buttoning her clothes.  (*Id.* at 44, 49.)  She found no position comfortable and was unable to sit longer than a half hour, or stand longer than ten minutes.  (*Id.* at 51–52.)  In her view, the treatments she underwent only marginally lessened her discomfort: physical therapy reduced pain "[a] little bit"; injections temporarily "helped for a period of time but then [the pain] came back"; and the prescribed brace helped "[a] little bit."  (*Id.* at 48, 50.)  She was unable to explain to the ALJ the discrepancy between her reported levels of

pain and the physician's statement that her pain was well controlled with medication as of November 27, 2012.  (*Id.* at 44–45, 758.)

In addition to her physical issues, Plaintiff also alleges depression.  (*Id.* at 224.)  On June 19, 2007, Plaintiff reported feeling "really depressed over the last few months," and Dr. Pierangelo stated her "[d]epression severely impacts her overall symptoms" of fibromyalgia and back pain.  (*Id.* at 435–36.)  On August 22, 2007, Dr. Pierangelo indicated Plaintiff's depression had become worse and that her pain affected her energy.  (*Id.* at 434.)  On January 20, 2010, Plaintiff presented symptoms "[s]ignificant for anxiety/depression," and Dr. Pierangelo stated she would continue with her "current regimen."  (*Id.* at 422.)  However, her mental health regimen prior to January of 2011 is unclear from the record.

On January 21, 2011, West Central Family and Counseling ("WCFC") assessed Plaintiff a global assessment of functioning ("GAF") score of 55.[3]  (*Id.* at 321, 338.)  Her "bouts of depression" were "due to inability to function being so young."  (*Id.* at 316, 333.)  She was described as feeling "hopeless" and having "non-specific thoughts/plans/intent" of suicide.  (*Id.* at 319, 336.)  Plaintiff thereafter entered into a treatment plan involving biweekly sessions for seven to twelve months.  (*Id.* at 322, 339.)  The record includes treatment notes from nine sessions that occurred between January 26, 2011 and June 23, 2011.  (*Id.* at 650–59.)  While significant events transpired during her treatment that impacted her emotionally, such as the first denial of her social security benefits, the death of her pet, and her daughter moving out of her home, Plaintiff "reported that each day gets better."  (*Id.* at 650–52.)  Midway through her treatment at WCFC, on March 16, 2011, Dr. Alex Altamirano completed a psychiatric evaluation of Plaintiff.  (*Id.* at 324–29.)  He assigned

---

[3] The GAF scale evaluates an individual's psychological, social, and occupational functioning on a scale of 0 to 100. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. TR 2000) ("DSM IV").  A score of 51 to 60 indicates moderate symptoms or difficulty in functioning. *Id.*  A score of 61-70 indicates "'some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'"  *Moon v. Astrue*, No. 1:10–cv–02147–SMS, 2012 WL 2369446, at *4, n.3 (E.D. Cal. June 21, 2012) (quoting DSM IV).

Plaintiff a GAF of 60 and described her as having normal intellectual ability, speech, thought

processes, cognitive abilities, and a good short term memory.  (*Id.*)

Psychiatrist Dr. Moris Pardo, from whom Plaintiff sought psychiatric services and

medication, assigned Plaintiff a GAF score of 65 on October 19, 2011.  (*Id.* at 765, 406.)  The Center

for Human Development completed an Adult Comprehensive Assessment report on May 4, 2012,

in which the preparer attributed Plaintiff's depression and sadness to her "worries of health

deterioration in future."  (*Id.* at 753.)  Her assigned GAF score at that time was 55.  (*Id.* at 756.)

On February 1, 2013, Plaintiff's therapist, Milagros Rivas, who had treated Plaintiff twice a

month since May 4, 2012, stated Plaintiff's "[t]reatment progress [had] been affected by progression

of medical problems causing restricted mobility and isolation.  Empowerment [had] been noticeable

by [Plaintiff's] increased self-advocacy."  (*Id.* at 765.)  On the same form, Ms. Rivas assigned Plaintiff

a GAF score of 55.  (*Id.*)  She further concluded Plaintiff was moderately functionally limited and

her impairments would cause her to be absent from work "more than four days per month."  (*Id.* at

767–68.)

Plaintiff testified at the administrative hearing that her depression caused her to feel nervous,

but she was unable to describe the ways that her mental states would affect her ability to work.  (*Id.*

at 42–43.)  She described her depression as feeling "worthless" since she felt like she was "not the

same person [she] was before."  (*Id.* at 53.)  Tasks like housework or doing too much in a day

required her to take time to recuperate, and "[j]ust about every day" she didn't "get out of bed

because of the pain."  (*Id.* at 54.)  She also indicated difficulty concentrating and needing "reminders

to take medications, [or to] go to appointments."  (*Id.* at 53–54.)

At the administrative hearing, the ALJ questioned a vocational expert to determine whether

a hypothetical individual with Plaintiff's age, education, and past work experience who is limited to

light exertional work and remembering and carrying out no more than simple instructions could

perform work found in the national economy. (A.R. at 56.) The vocational expert testified that

such an individual could perform work as an assembler, packer, and solderer, and that over 100

positions for these jobs exist in the regional economy and over 1,000 positions exist in the national

economy. (*Id.*) The vocational expert further testified that such a hypothetical individual could

perform Plaintiff's past work as a packer, not at the medium exertional level as she performed it, but

instead at the light exertional, unskilled level at which the position is generally performed. (A.R. at

55–58.)

B.      Decision of the ALJ

Following the hearing, the ALJ issued a decision on February 18, 2013 denying Plaintiff's

applications for SSDI and SSI benefits. (*Id.* at 28.) Plaintiff then filed a request for review with the

Appeals Council on April 18, 2013, which request was denied on June 16, 2014, thus making the

decision of the ALJ final. (*Id.* at 8, 1.) Plaintiff thereafter filed the instant action, the Commissioner

compiled the administrative record, and the parties submitted the cross-motions presently at issue.


III.      STANDARD OF REVIEW

The role of a district court in reviewing an administrative law judge's decision is limited to

determining whether the conclusion was supported by substantial evidence and based on the correct

legal standard. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3); *Manso-Pizarro v. Sec'y of Health & Human Servs.*,

76 F.3d 15, 16 (1st Cir. 1996) (per curiam). Substantial evidence is such relevant evidence as a

reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human

Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). The Supreme Court has defined substantial evidence as

"more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison

Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The court must uphold a Commissioner's conclusion "if a

reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to

support his conclusion," even if multiple other conclusions could be drawn from it.  *Rodriquez*, 647

F.2d at 222.  Additionally, it is the Commissioner's responsibility to weigh conflicting evidence and

decide issues of credibility.  *Id.*

## IV.     DISABILITY STANDARD AND THE ALJ'S DECISION

An individual is entitled to SSI benefits if she is disabled and demonstrates financial need on

or after the date of the SSI application.  *See* 42 U.S.C. § 1381a.  Plaintiff's financial need is not at

issue here.  Entitlement to SSDI benefits requires a showing of, among other things, insured status

and, prior to its expiration, disability.  *See* 42 U.S.C. § 423(a)(1)(A) and (D).  It is undisputed that

Plaintiff has met the insured status requirement.  (A.R. at 19.)

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity
> that he is not only unable to do his previous work but cannot, considering his
> age, education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146–49

(1987).

In determining disability, the Commissioner applies the following five-step analysis, as

outlined by the First Circuit:

> 1) if the applicant is engaged in substantial gainful work activity, the application
> is denied; 2) if the applicant does not have, or has not had within the relevant
> time period, a severe impairment of combination of impairments, the

application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

In the instant case, the ALJ first found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (A.R. at 19.) Second, the following impairments were found to be severe: "plantar fasciitis of the left foot; fibromyalgia; degenerative disc disease of the spine; scoliosis; major depressive disorder; and mood disorder." (*Id.*) Third, the ALJ found that none of these impairments, when considered alone or in conjunction with the others, met or medically equaled the severity of one of the impairments listed in 20 C.F.R. app. 1 § 404, subpt. P (2015). (*Id.* at 20.) Fourth, in reviewing the record in its entirety, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to engage in light work, although she is incapable of remembering and carrying out more than simple instructions. (*Id.* at 21.) In accordance with that finding, the ALJ concluded that Plaintiff is capable of performing past unskilled work. (*Id.* at 26–27.) In the alternative, the ALJ found at step five that Plaintiff was capable of performing other unskilled work at a light exertional level such as an assembler, packer, and inspector.[4] (*Id.* at 27) As a result, the ALJ determined that Plaintiff was not disabled. (*Id.*)

---

[4] The court notes the vocational expert testified a hypothetical individual with Plaintiff's RFC would be capable of performing light unskilled positions such as small parts assembler, hand packager, and *solderer*, (A.R. at 43–44, 57), whereas the ALJ cited the three positions as assembler, packer, or *inspector*. (*Id.* at 27.) In light of the ALJ's conclusion at step four, and the assembler and packer positions which were supported by the vocational expert's testimony, this discrepancy is immaterial.

V.   ANALYSIS

Plaintiff advances two arguments challenging the ALJ's decision.  First, Plaintiff asserts the

ALJ failed to afford adequate weight to the opinions of her treating therapist in evaluating her RFC.

Second, Plaintiff argues the ALJ failed to properly consider her subjective reporting of pain related

to her fibromyalgia in the RFC evaluation.  The Commissioner counters that a therapist does not

qualify as an acceptable medical source entitled to controlling weight.  Further, the Commissioner

asserts the ALJ, in reaching his conclusion, did not discount the treating physician's consideration of

Plaintiff's subjective assessment of pain levels but, instead, found significant discrepancies in the

record that discredited her allegations.  The court is not persuaded by Plaintiff's arguments.

A.    The ALJ Afforded Proper Weight to the Opinions of Ms. Rivas

Plaintiff argues the ALJ did not properly take into account the Medical Impairment

Questionnaire completed by Ms. Milagros Rivas (the "Questionnaire"), from whom Plaintiff sought

treatment as a therapist. Plaintiff asserts that the ALJ should have afforded this opinion more weight

as an "other source[]" under 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1).  (Pl.'s Mem. in Supp.

Mot. for J. on the Pleadings ("Pl.'s Mem.") at 9–10.)  The Commissioner argues that since Ms. Rivas

is not an "acceptable medical source," the ALJ appropriately considered her opinions, and

nonetheless discounted them for lack of supporting treatment records and for internal inconsistency.

(Def.'s Mem. in Supp. Mot. To Affirm ("Def.'s Mem.") at 14.)  The court finds that the ALJ

afforded appropriate weight to Ms. Rivas's opinions.

The opinion of a "treating source" must be afforded controlling weight in an administrative

law judge's decision "when that opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . .

[the] record."  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). When an administrative law judge does

not give controlling weight to a treating source, he or she must consider factors such as the length,

nature, and extent of the treating relationship, the opinion's supportability and consistency with the record as a whole, the treating source's area of specialization, and any other relevant factors. *Id.* The administrative law judge must also provide "good reasons" for the weight ultimately assigned to a treating source opinion. *See* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

However, a licensed mental health counselor is not among the professions considered to be "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a), and thus is not considered a treating source entitled to controlling weight. 20 C.F.R. §§ 404.1502 and 416.902 (defining "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."); *see also* SSR 06-03p, 2006 WL 2329939 at *2 (Aug. 9, 2006). Nevertheless, an administrative law judge may not "ignore 'other medical sources,'" such as Ms. Rivas, nor "fail to adequately explain the weight given to such evidence." *Taylor v. Astrue*, 899 F. Supp. 2d 83, 88 (D. Mass. 2012). When an administrative law judge fails to adequately explain the weight given to "other source" medical opinions such that a reviewing court cannot follow his or her reasoning, the court may find that the record provides insufficient evidence for affirming the decision. (*Id.* at 88–90.)

Here, the ALJ amply specified his reasoning for affording Ms. Rivas's opinions "minimal probative value." (A.R. at 25.) While he properly asserted that Ms. Rivas is "not an 'acceptable medical source'" under the regulations, the ALJ did give "careful consideration" to her opinions. (*Id.*) The ALJ explained that in the absence of evidence indicating Ms. Rivas obtained "special knowledge" as a "treating, primary care provider," he did not afford the conclusions in her Questionnaire "significant evidentiary weight." (*Id.* at 26.) *See* SSR 06-03p, 2006 WL 2329939, at *4– 5 (explaining that although the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c) do not explicitly apply to "other medical sources," they may be used in evaluating such opinion evidence

and there may be situations in which an "other medical source" outweighs an opinion of an

acceptable medical source).  The ALJ explained that he gave Ms. Rivas's opinions minimal weight

due to internal inconsistencies within the Questionnaire and a lack of supporting treating records.

(A.R. at 25–26.)

     The court finds that this explanation meets the standard elucidated in *Taylor* and is

adequately supported by the record.  The internal inconsistencies within the Questionnaire support

the ALJ's decision not to afford Ms. Rivas's assessment greater evidentiary weight.  Ms. Rivas

assigned Plaintiff a GAF of 55, consistent with her determination that Plaintiff has only moderate

functional limitations, and then, seemingly in contradiction, concluded that she would miss more

than four days of work per month.  (*Id.* at 765, 768.)  Moreover, the ALJ had sufficient basis for

reasoning that this "opinion does not provide supportable insight into the severity of the claimant's

impairments and how they affect her ability to function," as the Questionnaire was not accompanied

by supporting treatment records.  (A.R. at 26.)

     In addition, substantial evidence in the record supports the mental RFC the ALJ ultimately

assigned.  The WCFC assessment of Plaintiff's cognitive functioning from January 21, 2011

indicated her memory was intact and her thought process was logical.  (*Id.* at 337.)  The WCFC

treatment records show Plaintiff's incremental improvement over time, particularly in the final two

sessions: June 9, 2011, and June 23, 2011.  (*Id.* at 650–51.)  Dr. Altamirano's review of Plaintiff's

cognitive functions reflect additional functional abilities, such as normal judgment, speech, thought

processes, and a good memory.  (*Id.* at 327–28.)  On May 4, 2012, the Center for Human

Development stated that although Plaintiff's recent memory was impaired, her thought content,

intellectual functioning, insight, and judgment were all within normal limits.  (*Id.* at 751.)

     Moreover, unlike Ms. Rivas's opinion, the ALJ gave Dr. Pardo's opinion, which included an

assigned GAF score of 65, "significant weight."  (*Id.* at 22–23 n.2, 25.)  Not only does Dr. Pardo

qualify as a "treating source," but Ms. Rivas indicated Plaintiff had an "extended history" with Dr. Pardo, which would support the ALJ affording Dr. Pardo's assessment greater weight. (*See id.* at 765.) Dr. Pardo's history with Plaintiff, in combination with the record in its entirety, may indicate Plaintiff's steady psychological improvement resulting from medication and treatment. Whereas Ms. Rivas's conclusions of missing days of work were unsupported by the record, the ALJ explained that he found neither the record nor Plaintiff's own testimony at the administrative hearing in contradiction with Dr. Pardo's assessment. (*Id.* at 22–23 n.2.)

There is no error in the ALJ's decision to afford Ms. Rivas's Questionnaire no significant evidentiary weight, and further, no error in setting out his reasons for doing so. The opinion of the ALJ provides ample reasoning for the court to review his decision, and the court finds that the ALJ's determination is supported by substantial evidence in the record.

B.    The ALJ Appropriately Considered Subjective Assessment of Fibromyalgia

Plaintiff next argues, relying on *Johnson v. Astrue*, 597 F.3d 409 (1st Cir. 2009), that the ALJ erred in "concluding there was a lack of objective evidence with respect to her physical impairments" as to her fibromyalgia. (Pl.'s Mem. at 14.) The Commissioner, in turn, asserts that the ALJ did not discount Plaintiff's credibility with respect to her fibromyalgia symptoms based on a lack of objective evidence supporting them. (Def's Mem. at 17.) Rather, the Commissioner argues, the ALJ discounted Plaintiff's credibility based on inconsistencies between her allegations and both the subjective and objective assessments of her symptoms over time in the record. The Commissioner further argues Plaintiff is unable to show that any alleged error in this regard was harmful. (*Id.* at 17–18.)

The court finds that Plaintiff's argument is based on an inaccurate reading of the ALJ's decision. Fibromyalgia diagnoses typically are accompanied by a patient's subjective reporting of chronic body pain and points of tenderness. *Johnson*, 597 F.3d at 410. It is accepted by "[a] growing

number of courts . . . that 'there are no objective tests which can conclusively confirm [fibromyalgia].'" *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2nd Cir. 2003) (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)).  Tenderness at "trigger points *are* the only 'objective' signs of fibromyalgia." *Johnson*, 597 F.3d at 412.  It is therefore a medically sound and appropriate diagnostic tool for a physician to rely on a patient's subjective reporting of her pain.  *Id.*

Appropriately, and in contrast to Plaintiff's arguments, the ALJ did not discount Plaintiff's subjective symptomatic reporting to her treating physicians.  *See Greener-Younger*, 335 F.3d at 107; *Johnson*, 597 F.3d at 412.  The ALJ instead discounted Plaintiff's own subjective reporting of her pain at the hearing based on inconsistencies within the medical record, both from Plaintiff's own statements to physicians and from her physician's assessments of her progress.  (A.R. at 23–24.)  Plaintiff alleged that she suffered from debilitating pain as a result of her fibromyalgia[5] that precluded her from working.  (*Id.* at 23, 45.)  However, the record indicates—often through Plaintiff's self-reporting—that her pain was well-controlled with medication, physical therapy, her compliance with the recommended footwear, use of prescribed braces, and home exercise program.  (A.R. at 689–90.)  Further, by her own admission, Plaintiff was able to cook for an hour each day and stand for an hour to an hour and a half daily,[6] facts which the ALJ considered to undermine Plaintiff's credibility in claiming that her pain caused her to be debilitated.  (A.R. at 689–90, 23.)  Evidence in the record supports the finding that Plaintiff's enhanced functional capacity is conditional upon her following the recommendations given to her by her treating physicians, which she often failed to do.[7]  (*Id.* at 689–90, 700, 726.)

---

[5] While Plaintiff's alleged pain stemmed from multiple diagnoses, only her fibromyalgia is at issue here.  (*See* A.R. at 23.)
[6] Notably, Plaintiff reported to her physical therapist that she was able to stand for that length of time while wearing sneakers in compliance with her physical therapist's recommendation.  (A.R. at 689.)
[7] Plaintiff's non-compliance was, on two occasions, attributed to her financial situation.  (A.R. at 700, 742.)

Credibility determinations are left to the administrative law judge, whose ability to evaluate the consistency of the claimant's demeanor with the rest of the evidence "is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987). The ALJ in the instant case considered the inconsistency between Plaintiff's testimony and her self-assessment of symptoms in the record in making his determination that she lacked credibility. As the court finds no error in the ALJ's decision, there is no need to reach the question of whether Plaintiff has demonstrated that any error was harmful. Therefore, in giving deference to the ALJ's conclusion that Plaintiff lacked credibility regarding the duration, frequency, and intensity of her symptoms, the court finds that the ALJ's basis for relying upon the assessment of her treating physicians was not in error and was substantially supported by the record.

## VI.   CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) and ALLOWS the Commissioner's Motion to Affirm the Decision of the Commissioner (Dkt. No. 16). The clerk shall enter judgment for the Commissioner, and this case may now be closed.

It is So Ordered.


    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge